

FILED

Mar 30 2017, 5:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Stephen R. Buschmann
Thrasher Buschmann & Voelkel, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Matthew M. Price
Gregory A. Neibarger
Jessica Whelan
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Certain Tell City Annexation Territory Landowners,<br>*Appellants-Petitioners,*<br><br>v.<br><br>Tell City, Indiana,<br>*Appellee-Respondent.* | March 30, 2017<br><br>Court of Appeals Case No.<br>62A01-1603-MI-510<br><br>Appeal from the Perry Circuit Court<br><br>The Honorable William E. Weikert, Special Judge<br><br>Trial Court Cause No.<br>62C01-1407-MI-319 |

**Pyle, Judge.**

## Statement of the Case

[1] This case concerns the statutory question of what constitutes a necessary signature on a remonstrance petition for purposes of challenging a city's proposed land annexation. The Appellants/Petitioners, Certain Tell City Annexation Territory Landowners ("Property Owners"), filed a remonstrance

petition ("Remonstrance Petition") challenging a proposed annexation of their land by Tell City ("The City"). The trial court dismissed the Remonstrance Petition, holding that it did not contain the necessary signatures because many of the Property Owners' signatures were not compliant with statutory requirements.

On appeal, the Property Owners argue that the trial court misinterpreted the statutory requirements for remonstrance petitions and erred in dismissing the Remonstrance Petition. We agree that the trial court misinterpreted and added additional statutory requirements, and we find that the Petition did contain the necessary signatures. Therefore, the trial court erred in dismissing the Petition. We reverse and remand for further proceedings.

We reverse and remand.

## Issues

Whether the trial court erred when it dismissed the Property Owners' Remonstrance Petition.

## Facts

On April 7, 2014, the City adopted Ordinance No. 1074, in which it proposed to annex 1,776.4 acres of surrounding land (collectively, "Annexation Territory") into its corporate limits. Pursuant to Indiana law, owners of land in an annexation territory may remonstrate against an annexation by filing a written remonstrance and petition bearing the signatures of:

(1) at least sixty-five percent (65%) of the owners of land in the annexed territory; or

> (2) the owners of more than seventy-five percent (75%) in assessed valuation of the land in the annexed territory.

IND. CODE § 36-4-3-11(a). The Property Owners challenged the City's proposed annexation by filing such a petition, the Remonstrance Petition, with the trial court on July 8, 2014. Each real estate parcel was allocated a dedicated page within the Remonstrance Petition, and each parcel's page listed the parcel's number and address; the Property Owner's name as it appeared on the parcel's property tax duplicate; and a statement that the Property Owner intended to remonstrate against the annexation. Each page also included a line for the Property Owner's signature, a line for the Property Owner to print his or her name, and a line for the date the Property Owner signed the page. In total, 438 Property Owners signed the Remonstrance Petition.

[5] On May 12, 2015, after a pre-trial conference with the parties, the trial court ordered the Auditor of Perry County ("the Auditor") to review the Remonstrance Petition and evaluate whether it contained the necessary signatures for the Property Owners to have standing to remonstrate against the annexation.[1] Pursuant to the order, the Auditor was supposed to "create a Schedule of the parcels in the Annexation Territory using the names of the Owner(s) appearing on the tax duplicates for each of those parcels" and to

---

[1] Although not stated by the trial court, we have previously held that the issue of whether a remonstrance is signed by a sufficient number of landowners relates to the doctrine of standing. *See City of Boonville v. Am. Cold Storage*, 950 N.E.2d 764, 766 (Ind. Ct. App. 2011), *reh'g denied*. If the remonstrance is not signed by a sufficient number of landowners, then the landowners in the annexed territory do not have standing to challenge the annexation. *See id.*

"compare the Remonstrance Petitions . . . to the names on the Schedule." (The City's App. 39). The Auditor was also supposed to "make a notation for each parcel" regarding "whether a remonstrance petition, compliant with the provisions of [INDIANA CODE §] 36-4-3-11(b) [had] been filed."[2] (The City's App. 39-40). If the Auditor determined that a "Remonstrance Petition was filed for a particular parcel that [was] not compliant with the provisions of [INDIANA CODE §] 36-4-3-11(b)," the Auditor was required to "make a notation on the Schedule as to the reasons the Petition [was] not deemed compliant." (The City's App. 40).

[6]     The Auditor reviewed the Annexation Territory and Remonstrance Petition and filed a schedule ("Schedule") with the trial court as ordered. As documented in the Schedule, the Auditor found that there were 637 total parcels in the Annexation Territory and that 145 of the 438 signatures in the Remonstrance Petition did not comply with INDIANA CODE § 36-4-3-11(b). Based on these findings, only 45% of Property Owners in the Annexation Territory had signed the Remonstrance Petition and complied with INDIANA CODE § 36-4-3-11(b). The Auditor's reason for finding 145 signatures non-compliant was that they did not "exactly match any of the names listed on the tax duplicate such that the signatures may not comply with Indiana law." (The

---

[2] As we will discuss further in a later portion of this opinion, INDIANA CODE § 36-4-3-11(b) does not contain requirements for a "valid" signature. It provides that, "[i]n determining the total number of landowners of the annexed territory and whether signers of the remonstrance are landowners, the names appearing on the tax duplicate for the territory constitute prima facie evidence of ownership." I.C. § 36-4-3-11(b).

City's App. 37). For example, one person had signed as "Joe" instead of "Joseph," and some people had added middle initials. Also, some of the non-compliant signatures were those of trustees and authorized representatives of corporations who had signed on behalf of their trusts and/or corporations.

[7] At the agreement of the parties, the trial court next ordered the Auditor to revise and supplement the Schedule to include the assessed value for each parcel in the Annexation Territory, as well as the total assessed value of the Annexation Territory. The Auditor filed a revised schedule ("Revised Schedule") including these valuations. According to the Revised Schedule, the total value of the property owned by the Property Owners was not more than 75% of the total value of the Annexation Territory, as was required for standing to challenge the annexation pursuant to the property value prong of INDIANA CODE § 36-4-3-11(a).

[8] Subsequently, on September 21, 2015, the Property Owners filed a memorandum objecting to the Auditor's Revised Schedule. In their objection, the Property Owners argued that: (1) the Auditor's interpretation that the Property Owners' signatures on the Remonstrance Petition had to exactly match their names on their tax duplicates was arbitrary because no such standard was required by the remonstrance statute; (2) the Auditor had included parcels in the Annexation Territory that did not belong in the Territory; and (3) the Auditor had improperly counted state-owned parcels in the Annexation Territory as forty-eight separate parcels rather than one single parcel. In support of this third argument, the Property Owners cited *American*

*Cold Storage v. City of Boonville*, 977 N.E.2d 19 (Ind. Ct. App. 2012), in which this Court found that separate parcels acquired by the State for right-of-way on a state highway should be counted as a single parcel for purposes of an annexation remonstrance. Adjusting for these alleged errors, the Property Owners contended that there were 591, rather than 637, total parcels in the Annexation Territory and that the Remonstrance Petition contained 434 valid Property Owner signatures.[3] The Property Owners noted that 434 signatures constituted 73.04% of the total 591 parcels, which was a sufficient number of signatures for standing under INDIANA CODE § 36-4-3-11(a)(1).

[9] Thereafter, the City filed a response to the Property Owners' objection, as well as an objection of its own. In response to the Property Owners, the City argued that the Auditor's determination of which signatures complied with the statute was entitled to deference and that the Property Owners had not provided sufficient evidence to rebut the presumption that the Auditor's findings were valid. Further, the City asserted that a plain reading of the statute supported the Auditor's interpretation. With respect to the signatures of corporate representatives or trustees, in particular, the City contended that the Auditor could not properly deem the signature valid if the Auditor was unable to tell on the face of the Remonstrance Petition that the signor was authorized to sign on behalf of the entity. The City contended that the burden was on the Property

---

[3] It is not clear why the Property Owners contended that there were 434 valid signatures rather than 438, as the Auditor found.

Owners to prove the validity of the signatures, so any ambiguity should be resolved against them. As for the total number of parcels in the Annexation Territory, the City argued that the Property Owners had not proven that the State's forty-eight parcels in the Annexation Territory should qualify as only one parcel for purposes of the Petition. Finally, in its own objection to the Revised Schedule, the City noted that eleven of the Property Owners had withdrawn their signatures from the Remonstrance Petition since the Auditor had compiled the Revised Schedule.

[10] On December 10, 2015, the trial court held a hearing on the parties' objections. At the hearing, the City described the inconsistencies between the names on the tax duplicates and the signatures on the Remonstrance Petition as follows:

> Basically[,] there are 26 that added a middle initial, there are 12 that did not fully spell out a middle name, there are 12 that did not include a middle name, five (5) did not include the word trustee, even though they were signed [by] the person who is the trustee, two (2) did not use Jr. or Sr., two (2) added a middle name, we have some that added middle initials, we have one (1) that use[d] Joe instead of Joseph, one (1) that used Joseph instead of Joe, we have a John not a Johnathon, [] three (3) by personal representatives, one (1) of them a C looked like an E to the auditor. [W]e have a Tom instead of Thomas, several that did not include MD, signed the name but just didn't put MD[.] [T]hey are owned by doctors[.] [O]ne (1) signed, we had some sign using a new married name and in some cases they even identified [] that case, some we are not sure why they turned them down. . . . One (1) of them . . . the name was misspelled on the record card so in the signature the person signed their name and said it is misspelled on the record card[.]

(Tr. 10-11). Several Property Owners whose signatures the Auditor had rejected testified to rebut the Auditor's determination that they had not validly signed the Remonstrance Petition. Each of the Property Owners testified that he or she owned the land identified in the Remonstrance Petition and that he or she had signed the Petition. The Property Owners also presented evidence that the Auditor had incorrectly included several parcels in the Annexation Territory that did not belong in the Territory.

[11] Subsequently, the trial court entered findings of fact and conclusions thereon concluding that the Remonstrance Petition did not contain the necessary signatures for the Property Owners to have standing to challenge the annexation. The trial court ruled that the Auditor had "acted appropriately in invalidating certain signatures on the Remonstrance Petition [that] did not match the names appearing on the [corresponding] tax duplicate." (The Property Owners' App. 18). As for instances where the Remonstrance Petition was signed by a trustee or authorized representative of a trust or corporation owning property in the Annexation Territory, the trial court concluded that "the Auditor [had] correctly exercised her discretion in determining that the signatures were invalid" because the Auditor could not tell on the face of the Petition whether the representative was authorized to sign on behalf of the Property Owner. (The Property Owners' App. 19). The Court did not decide on the merits whether the State's forty-eight parcels should be counted individually or as one single parcel because it concluded that the Property

Owners would not have sufficient signatures even if it ruled in their favor.[4] The Property Owners now appeal.

# Decision

[12] This appeal concerns the statutory requirements for challenging an annexation through a remonstrance. The process of annexation consists of multiple stages. Generally, an annexation formally begins when a municipality adopts an ordinance annexing territory pursuant to either INDIANA CODE § 36-4-3-3 or INDIANA CODE § 36-4-3-4. *Fight Against Brownsburg Annexation v. Town of Brownsburg*, 32 N.E.3d 798, 801 (Ind. Ct. App. 2015). The legislative adoption of the ordinance is followed by an opportunity for affected landowners to appeal the annexation through a remonstrance. *Id.* INDIANA CODE § 36-4-3-11 details the requirements for a valid remonstrance.[5] As stated above, it provides that the remonstrance must be signed by:

> (1) at least sixty-five percent (65%) of the owners of land in the annexed territory; or
>
> (2) the owners of more than seventy-five percent (75%) in assessed valuation of the land in the annexed territory.

---

[4] Specifically, "[f]or the sake of this argument, [the court] accepted the Remonstrators' argument that all State-owned parcels should be counted as one (1) instead of the 48 parcels contained in the [Schedule]." (The Property Owners' App. 24).

[5] This statute has since been amended, but the amended version of the statute applies the same language to, and requirements for, annexation ordinances adopted before July 1, 2015.

I.C. § 36-4-3-11(a). Also, the remonstrance "must be accompanied by a copy of that ordinance, and must state the reason why the annexation should not take place." I.C. § 36-4-3-11(a). If the remonstrance is not signed by a sufficient number of landowners, then the landowners in the annexed territory do not have standing to challenge the annexation. *See City of Boonville*, 950 N.E.2d at 766.

[13] After receiving a remonstrance to an annexation, "the court shall determine whether the remonstrance has the necessary signatures." I.C. § 36-4-3-11(b). According to INDIANA CODE § 36-4-3-11(b):

> In determining the total number of landowners of the annexed territory and whether signers of the remonstrance are landowners, the names appearing on the tax duplicate for that territory constitute prima facie evidence of ownership. Only one (1) person having an interest in each single property, as evidenced by the tax duplicate, is considered a landowner for purposes of this section.

If, as a result of this review, the court determines that the remonstrance is sufficient, it must then schedule a hearing on the merits of the remonstrance. *Fight Against Brownsburg Annexation*, 32 N.E.2d at 800. At the hearing, the burden is on the municipality to demonstrate its compliance with annexation statutes. *Id.* at 801.

[14] Because the trial court determined that the Remonstrance Petition was not signed by a sufficient number of Property Owners, the Property Owners did not have standing to challenge the annexation. *See City of Boonville*, 950 N.E.2d at 766. Accordingly, on appeal, they argue that the trial court erred in

determining how many Property Owners had validly signed the Petition. They essentially dispute the trial court's interpretation of the statutory requirements for the "necessary signatures" on a remonstrance petition under INDIANA CODE § 36-4-3-11. Their arguments apply to three categories of remonstrance signers: (1) individual Property Owners; (2) trustees; and (3) authorized representatives of corporations. They argue that the trial court's interpretation of INDIANA CODE § 36-4-3-11(b)—that the signature of each of these signers had to match his or her respective name on his or her property tax duplicate exactly—was too restrictive of a standard and was not supported by the statute. We agree.

[15] To decide this issue, we must interpret the signature requirements under INDIANA CODE § 36-4-3-11. Our standard for statutory interpretation is as follows:

> Statutory interpretation is a question of law reserved for the court and is reviewed *de novo*. The cardinal rule of statutory construction is that if a statute is unambiguous, then we need not and cannot interpret it; rather, we must apply its plain and clear meaning. Additionally, when construing a statute, the legislature's definition of a word binds us. When the legislature has not defined a word, we give the word its common and ordinary meaning.

*Town of Whitestown v. Rural Perry Twp. Landowners*, 40 N.E.3d 916, 921 (Ind. Ct. App. 2015) (quoting *Vanderburgh Cty. Election Bd. v. Vanderburgh Cty. Democratic Cent. Comm.*, 833 N.E.2d 508, 510 (Ind. Ct. App. 2005)) (internal citations omitted), *reh'g denied*, *trans. denied*. Importantly, we may not "'engraft new words' onto a statute or add restrictions where none exist." *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013).

Here, the trial court concluded that "[INDIANA CODE] § 36-4-3-11 requires that the remonstrator's signature on the remonstrance petition exactly match the landowner's name on the tax duplicate." (The Property Owners' App. 18). However, this conclusion misconstrues the language of the statute. INDIANA CODE § 36-4-3-11(b) provides, in relevant part, that:

> [When the trial court is] determining the total number of landowners of the annexed territory and whether signers of the remonstrance are landowners, the *names* appearing on the tax duplicate for that territory constitute *prima facie evidence* of ownership.

(Emphasis added). It is clear that the purpose of the review process delineated in the statute is to verify that the signers are, in fact, property owners. *See* I.C. § 36-4-3-11 (providing that the trial court must "determin[e] . . . whether signers of the remonstrance are landowners"). Towards this end, the statute implies that the trial court may compare the name on the property tax duplicate to the name on the petition because the property tax duplicate could not constitute evidence unless the trial court could compare it to the petition. *See id.* However, the statute does not provide that the name on the property tax duplicate constitutes prima facie evidence only if it matches the *signature* on the petition; nor does it provide that the name on either the petition or the property tax duplicate must fit a certain format—and, by extension, "match"—to qualify as prima facie evidence. The pages for each parcel must be "signed," but the statute does not require a particular form of signature.

[17]     This first point, that the statute does not require a match between the name on a property tax duplicate and the signature on a petition, is important because it allows for a trial court to find that other aspects of a comparison between a petition and the corresponding property tax duplicates are relevant for establishing prima facie evidence of ownership. For example, the statute does not preclude the trial court from determining that any name, rather than signature, on the remonstrance petition that matches a name on the property tax duplicate establishes prima facie evidence of ownership. This distinction is significant here because the Remonstrance Petition contained "names" in addition to signatures. As stated above, each real estate parcel was allocated a dedicated page within the Remonstrance Petition, and the page listed that parcel's number and address; the Property Owner's name as it appeared on the property's tax duplicate for the parcel; a statement that the Property Owner intended to remonstrate against the annexation; a line for the Property Owner's signature; and a line for the Property Owner to print his or her name. Accordingly, each Property Owner's name was listed in three places—the Petition's documentation of the Property Owner's name as it appeared on the Property tax duplicate, the owner's printed name, and the owner's signature. The trial court concluded that the signature had to exactly match the property tax duplicate, but we disagree in light of the language of the statute. Instead, we conclude that the statute allowed for the tax duplicate to constitute prima facie evidence of ownership if it was the same as the Petition's statement of the Property Owner's name in any of these three contexts.

[18] Utilizing this interpretation, we must recalculate the number of qualifying signatures on the Remonstrance Petition. The Auditor initially accepted 293 of the signatures on the Remonstrance Petition and rejected 145. Then, as documented in the City's objection to the Auditor's Revised Schedule, owners of eleven parcels withdrew their signatures from the Remonstrance Petition. The Auditor had already rejected three of these signatures in the Schedule, which meant that 285 signatures that the Auditor had approved and 142 signatures that the Auditor had rejected remained on the Remonstrance Petition.[6] Based on our review of the rejected petitions and the Auditor's documentation of the names on the property tax duplicates, we conclude that the pages for 120 of the rejected signatures included a name, whether in typed, printed, or signed form, that exactly matched the corresponding tax duplicate. Of the remaining twenty-two signatures that the Auditor rejected and that do not have an exact name match, an additional four signatures were confirmed as belonging to valid Property Owners at the hearing. Accordingly, in sum, we conclude that there was prima facie evidence—unrebutted by the City—that there were compliant signatures of 409 Property Owners on the Remonstrance Petition.

[19] While the above analysis applies to the names on the Remonstrance Petition that matched the names on the property tax duplicates, we also noted above

---

[6] The trial court found that the Auditor had already rejected four of these signatures and had approved seven, but our review of the record has revealed that the Auditor had rejected three and approved eight.

that the statute does not require a name on the tax duplicate to fit a certain format—and, by extension, "match"—the name on the Petition to qualify as prima facie evidence. This distinction is significant because many of the signatures and names on the Remonstrance Petition differed, but differed only slightly, from the corresponding names on the property tax duplicates. The Property Owners argue that these slight deviations should not have disqualified the Property Owners' signatures. We agree.

[20] In support of the Property Owners' argument, we note that in *Wherry v. Backelman*, 130 N.E.2d 777 (Ind. Ct. App. 1955), this Court considered a similar question of how to count names on a petition to abandon a school. The statutory language in that case required a "majority of the resident taxpayers of any school township" to petition the trustee or board of trustees for the abandonment of any high school. *Id.* at 778. When counting the names, the trial court noted that several of the signatures on the petition contained derivatives or expansions of the names on the property tax duplicates, such as "Jim Springer" instead of "James L. Springer" and "Homer Studebaker" instead of "H.J. Studebaker." *Id.* at 777, 778. When affirming the trial court's decision that these derivatives constituted qualifying signatures, we noted that "[i]t is a general rule that a person may be designated in a legal proceeding by the name by which he is commonly known, even though this does not constitute his true name." *Id.* at 778. Further, we explained that "[i]n arriving at whether the petition is a valid one, . . . the law is primarily concerned with the question of the correct identity of the person so signing." *Id.* at 779.

Accordingly, when an individual signed the petition using the word "Mrs." or "using initials," for example, "the same create[d] a presumption that she [was] signing the petition for herself, and it then bec[ame] the duty of the governmental official to determine whether or not the identification of such individual so signing [was] the same person whose name appear[ed] upon the tax duplicate." *Id.*

[21] Similarly, in *Marshall Cty. Tax Awareness Comm. v. Quivey*, 780 N.E.2d 380 (Ind. 2002), our supreme court held that signatures that contained minor deviations from the property owners' names as listed on their property tax duplicates were valid in a remonstrance petition to block a school building improvement plan. There, the County Auditor had invalidated the signature of David Good, a co-trustee of the "David A. Good and Norma Jean Good Rev Living Trust" because he did not sign "as Trustee." *Id.* at 385. On review, our supreme court noted that there was no statutory requirement for a trustee to sign a remonstrance petition in his capacity as trustee. *See id.* The only requirement for signatures was that: "All *names* should be written and printed neatly, and as they appear on the tax records in the Auditor's office as nearly as possible." *Id.* (emphasis added). The supreme court noted that the Auditor's disqualification of David Good's signature was an error because "[a]rguably the 'name' is only 'David Good,' even if his title is 'trustee.'" *Id.* Regardless, the supreme court held that "imperfect identification" of property owners on the petition was allowable and that "[s]ignatures that [did] not violate any statutory or Board of Accounts directive should [have been] counted if it [was] clear who the property

owner [was] and that the person signing for that property [was] authorized to do so."[7] *Id.* David Good's signature on behalf of his trust met those criteria because the Auditor had "no difficulty" identifying the signer "David Good" as the co-trustee of the "David A. Good and Norma Jean Good Revocable Living Trust." *Id.*

[22] Notably, we have also previously clarified that:

> A signing may be accomplished in a number of ways. When a person intends for the mark or name to represent his signature on a document, it meets the requirements of the law. In certain situations, initials may constitute a legal signature.

*Gibson v. State*, 661 N.E.2d 865, 868 (Ind. Ct. App. 1996), *trans. denied.* This is a non-exacting standard that does not require an individual's legal signature to precisely match his or her name in order to represent the individual.

[23] Based on the above precedent, we conclude that a signature on a remonstrance petition may qualify as proof of ownership and the Property Owner's intent to sign the remonstrance even if it deviates insignificantly from the property tax duplicate. As stated above, it is clear that the Legislature's primary concern was that the court identify the signers as landowners. *See* I.C. § 36-4-3-11. And, as we held in the cases above, it is possible to verify identity without having an exact name match. Few would dispute that "Jim Springer" is the

---

[7] The statute required that the verification of petitions and remonstrances be done "'in the manner prescribed by the state board of accounts.'" *Id.* (quoting I.C. § 6-1.1-20-3.2(4)).

same person as "James L. Springer," or that "David Good" is likely a trustee of a trust titled "David A. Good and Norma Jean Rev Living Trust." As an extension of this principle, the *Gibson* Court noted that Indiana law recognizes that a person may "sign" a document with only initials. *See id.*

[24] Our interpretation that signatures may contain minor deviations if it is still possible to identify ownership is consistent with our rules of statutory interpretation and the evidentiary standard that the legislature included in the statute. First, as noted above, we are not allowed to "'engraft new words' onto a statute or add restrictions where none exist." *Kitchell*, 997 N.E.2d at 1026. The statute here did not explicitly state that the signatures on a remonstrance petition must match the property owners' corresponding names as listed on their property tax duplicates. Thus, we may not add such a requirement to the statute.

[25] Second, the Legislature did not establish an exhaustive method for determining property ownership. It provided that the name on the property tax duplicate constitutes "prima facie evidence" of ownership. I.C. § 36-4-3-11. Black's Law Dictionary defines "prima facie evidence" as "[e]vidence that will establish a fact or sustain a judgment unless discredited by other evidence." BLACK'S LAW DICTIONARY 677 (10th ed. 2014). The prima facie standard implies that while certain evidence may be sufficient to establish a fact, it is not, by necessity, the only evidence that may establish that fact. *See City of Boonville*, 950 N.E.2d at 768 ("[T]he tax duplicate, as the term is used in [INDIANA CODE §] 36-4-3-11(b), is prima facie evidence of ownership. It is neither an irrebuttable nor a

sole source of evidence.")[8] This is a flexible standard that does not require a specific form of evidence to establish ownership.

[26] Based on this interpretation and our review of the record, we conclude that an additional seven Property Owners whose signatures the Auditor rejected were compliant with the statute. Combined with the signatures we have previously found to be compliant, there were a total of at least 416 compliant signatures on the Remonstrance Petition. The City disputes on cross-appeal how many total parcels there were in the Annexation Territory for purposes of determining the percentage of Property Owners that signed the petition. However, we conclude that even if we find in favor of the City on that issue and determine that there are 626 total parcels, the Property Owners had a sufficient percentage of signatures for standing—66.29%. Accordingly, we need not address the City's cross-appeal issue that the court should have counted the State's parcels as forty-eight separate parcels rather than one parcel.[9] We conclude that the trial

---

[8] The City argues that, regardless of the statutory language, the standard that the Auditor used for determining statutory compliance should be binding on the Property Owners because they agreed to the Auditor's process in a pre-hearing conference. However, while the trial court's order stated that the Property Owners had agreed to allow the Auditor to compare the Remonstrance Petition signatures to property tax duplicates, there is no evidence in the record that they agreed to the Auditor's interpretation that any signatures that did not match the property tax duplicates exactly would be disqualified. Further, as our supreme court noted in *Marshall County Tax Awareness Committee*, restrictions that are not authorized by statute are not enforceable. *See* 780 N.E.2d at 385. There, even though all three parties had signed a "Memorandum of Understanding" concerning requirements for valid signatures on a petition, the requirements that were not authorized by statute were unenforceable. *See id.*

[9] We also need not address whether trustees or corporate representatives were required to prove that they were authorized to sign the Remonstrance Petition on behalf of their trusts and/or corporations. When we subtract the parcels whose authorized representatives testified at the hearing, only eight parcels remain at issue. Even if we exclude these parcels from the total number of compliant signatures on the Petition and

court erred in dismissing the Remonstrance Petition on the basis that it did not contain the necessary signatures, and we reverse the trial court's decision.

Reversed and remanded.

Bradford, J., and Altice, J., concur.

---

assume that there are 626 total parcels in the Annexation Territory, the Property Owners still have a sufficient percentage of signatures for standing—65.17%.